## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE  DIVISION

| | | |
|---|---|---|
| **ROBERT LEE SACRA, JR.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:22CV00244 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **SGT. AUSTIN H. HAGA, ET AL.,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Defendants. | ) | |

*Robert Lee Sacra, Jr., Pro Se Plaintiff; Megan L. O'Brien, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, CRIMINAL JUSTICE AND PUBLIC SAFETY DIVISION, Richmond, Virginia, for Defendants.*

The plaintiff, Robert Lee Sacra, Jr., a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983, alleging use of excessive force, deliberate indifference to risks of serious harm, and violations of state law. After review of the record, I conclude that the defendants' Motion for Summary Judgment motion must be granted in part and denied in part.

### I.    BACKGROUND.

#### A. Sacra's Complaint and Claims.

Sacra's claims are based on events that allegedly occurred at River North Correctional Center (River North), a prison facility operated by the Virginia Department of Corrections (VDOC).  I will consider his Corrected Amended Complaint, ECF No. 75, as the operative pleading in the case.  The defendants are

Sergeant Austin H. Haga, Sergeant Marc E. I. Bilbrey, and Correctional Officers Jeffrey S. Bemis, Michael W. Restuccia, Michael B. Koger, and Billy D. Robinson.

Sacra alleges that on May 29, 2021, around 9:00 p.m., officers sprayed Sacra with OC spray,[1] pulled him out of his cell, and placed him in handcuffs and shackles. Sacra claims that the effects of the OC spray applied to his eyes and mouth impaired his vision and motor skills, made his breathing difficult, and he suffered a panic attack. As he lay on the floor, face down in full restraints, the sergeants and officers picked him up and carried him to the restrictive housing unit (RHU). Sacra contends that they "lifted [him] in such a manner that the majority of [his] body weight was being placed on [his] wrists, putting extreme pressure and force on them. The officers were lifting [him] by the handcuffs instead of distributing [his] weight throughout [his] body." *Id*. at 1. During this escort process, "[t]he handcuffs sliced into the back of [Sacra's] hand," causing a permanent scar on the back of his hand, and his left wrist was "fractured due to the amount of force and pressure placed against it." *Id.*

---

[1] The term refers to Oleoresin Capsicum, a chemical agent commonly known as pepper spray or mace. *Park v. Shiflett*, 250 F.3d 843, 848–49 (4th Cir. 2001). "The effects of OC spray include (1) dilation of the capillaries and instant closing of the eyes through swelling of the eyelids, (2) immediate respiratory inflammation, including uncontrollable coughing, retching, shortness of breath and gasping for air with a gagging sensation in the throat, and (3) immediate burning sensations to the mucous membranes, skin and inside the nose and mouth." *Id.* at 849.

Sacra also states that during the escort, the officers dropped him, causing his face to slam into sidewalk, breaking his two front teeth and "shoving them up into [his] gums and knocking [him] unconscious." *Id.* The officers deposited Sacra on the floor of the RHU, unconscious, where he remained unattended for ten minutes. As he lay unconscious on the floor, Sacra claims his "buttocks were exposed," which he learned later from "derogatory comments of a sexual nature" made by other inmates. *Id.* at 3.

Sacra asserts that from these experiences, he has "suffered extreme mental anguish and emotional distress." *Id.* He has also experienced a decline in his mental health disorders, which include depression and anxiety. He "suffer[s] panic attacks regularly, shake[s] uncontrollably, [has] PTSD-like symptoms," and has "night terrors and difficulty sleeping." *Id.*

Liberally construed, Sacra asserts the following claims:

1. By carrying Sacra to the RHU in the manner they did, or by allowing him to be carried in that manner, the defendants used or allowed excessive force against Sacra, in violation of the Eighth Amendment, and assaulted and battered him, in violation of state law.

2. The defendants acted with deliberate indifference to substantial risks to Sacra's safety while escorting him, or failed to respond

reasonably to protect him, in violation of the Eighth Amendment, and they were also negligent under state law.

3. The defendants violated the Prison Rape Elimination Act (PREA) by leaving Sacra's buttocks exposed while he lay on the floor of the RHU.[2]

Sacra seeks monetary damages.

### B. The Defendants' Summary Judgment Evidence.

The defendants move for summary judgment as to Sacra's claims. In support of their motion, they submit affidavits from each of the defendants; an affidavit from the River North investigator (Earhart) that narrates the content of six clips of video footage also before the court, showing the progress of the officers as they escorted Sacra to the RHU; incident reports; and an affidavit from a nurse concerning medical records related to the incident. This evidence paints a picture of events different from Sacra's version.

---

[2] In a responsive pleading, ECF No. 92-2, Sacra appears to assert that he has a right in this action to pursue criminal charges against some or all of the defendants under Virginia Code Ann. § 18.2-498.3. This contention is apparently based on his belief that some defendants have stated untruths in their affidavits or other documents. Sacra has no right to instigate criminal charges. *Lopez v. Robinson*, 914 F.2d 486, 494 (4th Cir. 1990). Moreover, the statute he cites, Va. Code Ann. § 18.2-498.3, makes it a felony to knowingly provide false information during any party's commercial dealings with the Commonwealth of Virginia or another local government in the state. This statute has no relevance to any of the defendants' alleged actions at issue in this case. Therefore, I have not construed Sacra's submissions as raising any claim based on the alleged inaccuracies of the defendants' affidavits or other documents.

On the night of May 29, 2021, while making security checks in C Building, Restuccia banged on Sacra's cell door several times and received no response. Restuccia saw Sacra's cellmate, inmate Davis, at the back of the cell leaning over the toilet.  When Restuccia called out to Davis, the inmate was unresponsive. Restuccia notified his supervisors, Sergeants Haga and Bilbrey, who reported to that area.  Officers Bemis and Koger also arrived to assist.  When the cell door was opened, Haga and Bilbrey began talking to Sacra.  He was on his bed initially but stood up and seemed cooperative at first.  Koger states that Sacra appeared to be intoxicated — smelling of alcohol, slurring his words, and rocking or stumbling as he attempted to stand.  Haga also smelled alcohol in the cell.

The sergeants instructed Sacra to get his clothes and shoes and comply with restraint procedures so they could remove him from the cell and search it.  Sacra then became confrontational, picked up a writing utensil as though it was a knife, and refused to obey orders to be restrained.

Based on Sacra's behavior, Haga deployed a one-half to one-second burst of OC spray toward Sacra's eyes.  The officers were then able to pull Sacra out of the cell, place him on the floor, and apply handcuffs and shackles, so they could check on inmate Davis.  Davis admitted that he and Sacra had been drinking.  Haga searched Sacra and found a weapon made from wood, approximately four and one-

half inches long and sharpened to a point.  Ranking officers decided that Sacra and Davis should be moved to the RHU.

Officers helped Sacra to his feet and tried to escort him to the RHU.  However, he refused to stand or walk, making a routine escort impossible.  So, the officers carried him, one officer holding each of his arms and legs.  The officers deny that they lifted Sacra at any time using only the handcuffs or shackles.  The escort group that left C Building with Sacra consisted of Haga, Koger, Bemis, and Restuccia.

Bilbrey assisted in removing Sacra from the cell and placed handcuffs on him. Bilbrey then helped other officers in restraining and escorting Inmate Davis to the RHU.  Davis cooperated with restraint procedures and walked with two officers to the RHU.  Bilbrey did not assist in transporting Sacra to the RHU and does not recall assisting further in placing Sacra in his cell there.

When staff members transported Sacra from the C Building to the RHU in A Building, part of the route was outdoors, where it was raining.  They carried Sacra, facing downward, by his arms and legs.  Sacra and the officers were soon wet from the rain.  On top of those problems, Sacra started kicking, screaming, and flailing.

Officer Robinson, reporting to the scene to assist with the escort, saw that officers were carrying Sacra by his arms and legs, and not by his restraints.  Robinson stepped in and assisted by holding Sacra's legs.  Robinson states that Sacra smelled of alcohol.  During the escort, Sacra kicked an officer in the chin and tried to bite

Koger.  Koger told Sacra two times not to bite him, but Sacra bit near Koger's thigh, pulling the hairs on Koger's leg, which was painful.

Because of the wet weather, Sacra's tall stature, and his physical combativeness, Sacra was difficult to hold.  The officers report that one or more of them accidently lost hold of Sacra's upper body, and he fell onto the sidewalk in the area known as the boulevard.  The defendants deny intentionally dropping Sacra.  Bemis says that he tried to keep Sacra from falling and received a scrape on his arm in doing so.  After the drop, staff picked Sacra up again and carried him to A Building.  The officers admit, however, that they purposely put Sacra down on the ground on another occasion because he was heavy and combative, the weather was wet, and the officers were fatigued.  Once the group reached the RHU, they placed Sacra on the floor.  He continued to kick and resist, so the officers left him in restraints.  They state that Sacra's pants were on and pulled up to normal position, without exposing his bare buttocks.

After several minutes, Nurse Freeman arrived to evaluate Sacra.  The officers lifted Sacra to his feet and placed him in a seated position.  Bemis assisted in holding Sacra up while the nurse cleaned and checked his face.  Freeman states that Sacra was uncooperative, yelling, and spitting blood on the floor by the nurse's feet.  The nurse reported that Sacra was disoriented and drunk and that he refused to comply with any further medical evaluation.  The nurse noted that Sacra was possibly

missing his two front teeth, but she could not confirm his condition because of his agitation. The nurse also reported that Sacra had a quarter-sized knot on the right side of his head. The nurse notified the doctor of these findings. Notes indicate that the nurse was unable to educate Sacra on how to access medical care through sick call or seek emergency medical care while in the RHU and that she was unable to take his vital signs, due to his agitated state.

Officers took Sacra to a nearby cell, where they placed him face down on a bed. They removed his clothing for his safety and for decontamination purposes and provided him with a blanket-like safety smock. Sacra screamed during this process, accusing officers of trying to rape him. The officers placed a tether on Sacra's handcuffs and continued to hold him while trying to remove the handcuffs and shackles. Sacra kicked and resisted the officers' efforts. Even after the officers removed all restraints and left the cell, Sacra continued to kick and roll, and then grabbed the smock and stood at the cell door screaming.

While searching the cell Davis and Sacra had shared, officers located and removed several contraband items. These included numerous Pepsi bottles filled with intoxicants, photos of a device called a "stinger" in prison slang used to heat water or mash, vent tubes and parts used to make intoxicants, and other parts used to make stingers or tattoo guns, razor blades, pieces of wire, batteries, and a tattooing

needle.  Sacra was charged with possession of intoxicants, possession of a weapon and possession of contraband.

### C.  Sacra's Summary Judgment Evidence.

In response to the defendants' motion, Sacra refers to unchallenged video clips and offers his sworn statements and other documents that provide a contrasting interpretation of events.  *See* ECF Nos. 92, 94, 100, 105, 121.  Sacra denies that he had been drinking alcohol on May 29, 2021, and asserts that he asked for a breathalyzer test, but officers denied having such an option.  Sacra states that he was on his bed listening to music that afternoon.  In response to the officers' banging on the door and barking orders, Sacra claims he was "in fear for [his] life, safety and wellbeing," and began "having a panic attack," "could not see," and "was paralyzed with fear."  Resp. Opp'n ¶ 6, ECF No. 92-1.

Sacra contends that the officers must have known it was raining outside, but they chose to carry him to the RHU instead of using a wheelchair or a gurney.  He asserts that for much of the transport, the officers caused the majority of his body weight to be borne by the handcuffs or by his wrists, forearms, or shoulders in a painful manner.  He screamed and cried for them to stop.  He submits that what the defendants describe as his combativeness was his writhing in pain.  Sacra states that the officers purposely dropped him two or three times on the trip to the RHU (face down, as shown on video) and ignored the fact that he was bleeding.  He also points

out that the officers changed places or readjusted their grips multiple times while carrying him.  He claims that more than two minutes of the transport is not summarized by Earhart, during which time the officers could have been carrying Sacra by the restraints alone.  Sacra also asserts that he was not acting in a disruptive manner during the medical assessment in the RHU; he claims that he was in and out of consciousness during that time.

Sacra provides evidence that the charge against him for possession of contraband was expunged from his record because the items belonged to Davis. Sacra denies that he incurred a disciplinary charge for intoxication or that he attempted to bite any officer on May 29, 2021.  Sacra also provides additional details about the harm he suffered, including the fact that his dental injuries required multiple trips to an oral surgeon, two root canals, and having his two front teeth rebuilt.  He states that he received physical therapy for his left shoulder and a brace for his wrist.[3]

---

[3]  Sacra cites to multiple documents, particularly medical reports, that were apparently provided to him in discovery, but are not part of the court's record of the case. However, the defendants have not disputed the accuracy of Sacra's description of his injuries and medical care.

## II.     DISCUSSION.

### A.  The Summary Judgment Standard.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, "[t]he Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Shaw v. Foreman*, 59 F.4th 121, 129 (4th Cir. 2023). The court "may not weigh the evidence or make credibility determinations." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019).[4]

A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To avoid summary judgment, a party must "must set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his or her favor. *Id.*  Thus, the court's summary judgment inquiry is whether the evidence, taken in the light most favorable to the nonmoving party, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

---

[4]  I have omitted internal quotation marks, alterations, and/or citations here and throughout this Opinion, unless otherwise noted.

that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).

A pro se litigant's verified complaint and amended complaint, or other verified submissions, must be considered as affidavits and may defeat a motion for summary judgment "when the allegations contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021). Where the plaintiff's version of events is so utterly discredited by unchallenged video footage that no reasonable jury could believe him, summary judgment is appropriate. *Scott v. Harris*, 550 U.S. 372, 380-381 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) ("[W]here . . . the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape.").

## B. Initial Matters.

As a preliminary matter, the VDOC defendants correctly note that a plaintiff may not recover damages against state officials sued in their official capacities under § 1983. "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, to the extent that Sacra sued the defendants in their official capacities for monetary damages under § 1983, I will grant the motion for summary judgment as to such claims.

I will also grant summary judgment for the defendants as to Sacra's Claim 3, alleging that officers violated his rights under PREA, 34 U.S.C. §§ 30301–30309. It is well established that "[n]othing in the PREA suggests that Congress intended to create a private right of action for inmates to sue prison officials for noncompliance with the Act." *De'lonta v. Clarke*, No. 7:11-CV-00483, 2012 WL 4458648, at *3 (W.D. Va. Sept. 11, 2012) (collecting cases), *aff'd*, 548 F. App'x 938 (4th Cir. 2013) (per curiam) (unpublished). Moreover, even if the defendants somehow violated VDOC procedural rules allowing inmates to report PREA-related situations, such violations of state law do not give rise to any federal due process issue actionable under § 1983. *Riccio v. Cnty. of Fairfax,* 907 F.2d 1459, 1469 (4th Cir. 1990). Therefore, Sacra's allegations fail to state an actionable claim for relief based on any alleged violation of PREA provisions.

## C. Excessive Force and Failure to Intervene.

Sacra asserts that after removing him from his cell on May 29, 2021, the defendants used excessive force or failed to intervene when others were doing so. An Eighth Amendment claim of excessive force involves both an objective and a subjective component. *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019). In assessing the objective component, the court must ask whether the nature of the force used was objectively "harmful enough" to establish a constitutional violation. *Wilson v. Seiter*, 501 US 294, 303 (1991). "This is not a high bar; de minimis or

trivial force is not enough, but anything more will suffice." *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021).  The extent of resulting injury is one factor to consider regarding the amount of force applied and whether it was plausibly considered necessary. *Wilkins v. Gaddy*, 559 U.S. 34, 36 (2010).

The subjective component requires a plaintiff to establish that a correctional officer "acted with a sufficiently culpable state of mind." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)).  "In contrast to the objective component, this is a demanding standard, the state of mind required . . . is wantonness in the infliction of pain." *Brooks*, 924 F.3d at 112.  The inmate must establish that force was applied "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline."  *Dean*, 984 F.3d at 302.  To assess an officer's state of mind, I must consider four non-exclusive factors: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." *Iko*, 535 F.3d at 239.

An officer who does not personally use excessive force against an inmate may nonetheless be subject to liability under § 1983 if he fails to prevent other officers from violating the inmate's constitutional rights.

The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of

who commits them.  Therefore, if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and treated accordingly.

*Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002).

Sacra does not challenge the officers' use of OC spray or the initial application of handcuffs and shackles as excessive force in this case.  He states, "Excessive Force did not occur prior to being placed in full restraints."  Resp. Opp'n 31, ECF No. 92-1.  Taking the evidence in the light most favorable to Sacra, including the video, he asserts that once he was out of the cell, with the weapon removed from his person, in restraints, and disoriented by OC spray, he was no longer a threat, making no further use of force necessary.  Taking the evidence in the light most favorable to Sacra, he was in fear for his life, was having a panic attack, and was physically impaired from the OC spray.  With other escort options available (such as a wheelchair or gurney), Sacra characterizes the officers' physical transport method as an unreasonable use of force sadistically intended to inflict pain on him by those who participated, authorized, or failed to prevent it.  During the transport, Sacra verbally informed those transporting him of the pain being inflicted from their methods, which included dropping him onto concrete on his face one or more times.  He was bleeding enough to leave a pool of blood on the sidewalk, and he suffered undisputed, serious injuries from their transport methods.

In support of summary judgment, the defendants rely on the video footage, which I have studied.  I cannot find that this footage so clearly contradicts Sacra's account of events that I could rely on it at this stage of the proceedings to grant summary judgment for the defendants on the excessive force claim.  *Scott*, 550 U.S. at 378.  A reasonable jury could conclude from the evidence, including the video, that the defendants, with the exception of defendant Bilbrey, used force (or failed to prevent force) that objectively caused serious harm to Sacra and did so maliciously to cause, or continue to cause, harm to him after he informed them of the pain their transport methods were causing him.  Therefore, I will deny the defendants' summary judgment motion as to the excessive force and related bystander claims, except for the claims against Bilbrey.

### D. *Deliberate Indifference to Inmate Safety*.

Sacra also asserts that the defendants failed to protect his safety while transporting him to the RHU.  In the prison context, the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned."  *Iko*, 535 F.3d at 238.  To establish an Eighth Amendment conditions claim, an inmate must make two showings: (1) objectively, "the deprivation suffered or injury inflicted on the inmate was sufficiently serious," and (2) subjectively, "the prison official acted with a sufficiently culpable state of mind."  *Id.*  "[A]bsent intentionality, a condition imposed on an inmate cannot properly be called punishment, and absent severity,

such punishment cannot be called cruel and unusual." *Id.*  More specifically, the plaintiff must show that he sustained a serious or significant mental or physical injury caused by the challenged conditions.  *Strickler v. Waters*, 989 F.2d 1375, 1380-1381 (4th Cir. 1993).  As in the excessive force context, bystander defendants aware of the safety hazards who did not respond reasonably may also be liable for a violation of the plaintiff's rights.  *Randall*, 302 F.3d at 203.

Taking the evidence in the light most favorable to Sacra, including the video, I find material issues of disputed fact that preclude summary judgment on the conditions and related bystander claims as to all defendants with the exception of defendant Bilbrey.[5]  The evidence shows that Sacra was unable or refused to walk with the escorting officers.  Rather than obtaining a wheelchair or gurney to move Sacra to another housing area through the rain, the defendants chose to carry him, face down, by his arms and legs.  Sacra verbally informed the defendants that their carrying methods were causing him pain.  Even after the defendants admittedly dropped Sacra on his face on concrete one or more times and he was bleeding, they

---

[5]  The defendants assert that Sacra has not stated facts supporting a supervisory liability claim against Haga and Bilbrey.  I find no merit to this argument, because Sacra expressly states that the sergeants participated personally in carrying him to the RHU. Independent, undisputed evidence proves that Bilbrey did not participate in that transport effort, as further discussed herein.  However, Haga admits that he did so.  On these facts, I find no indication that Sacra seeks to hold either of these defendants liable merely based merely on their supervisory capacities.

continued utilizing the same or similar carrying techniques.  From their actions, Sacra suffered undisputed, serious injuries.  I cannot find that the video footage so clearly contradicts Sacra's account of events that I can rely on it at this stage of the proceedings to grant summary judgment for the defendants on the hazardous conditions claim or the related bystander claims, except as to defendant Bilbrey.[6] *Scott*, 550 U.S. at 378.

### E.  Defendant Bilbrey.

As indicated, I will grant summary judgment on the excessive force, hazardous conditions, and bystander liability claims against defendant Bilbrey. Undisputed evidence shows that after Bilbrey assisted in extracting Sacra from the shared cell, Bilbrey did not participate in transporting Sacra to the RHU or accompany the officers who did so.  Rather, Bilbrey's affidavit as corroborated by the video indicates that he assisted in taking inmate Davis out of the shared cell and in escorting him to the RHU.  Moreover, as video footage indicates, the officers escorting Sacra out of the C Building at first carried him by supporting his weight under his arm pits, not by his restraints, wrists, or forearms as allegedly occurred in

---

[6] The defendants assert that they are entitled to summary judgment on the ground of qualified immunity.  However, when resolution of the qualified immunity question and the case itself both depend on a determination of what actually happened, summary judgment on the ground of qualified immunity is not proper.  *Buonocore v. Harris*, 65 F.3d 347, 359 (4th Cir. 1995).

other stages of the escort.  Thus, I find no disputed fact on which Sacra could persuade a fact finder that Bilbrey knew officers would use excessive force against Sacra or fail to protect him from harmful conditions while transporting him.[7]

### F.  Claims under State Law.

Sacra asserts supplemental state law claims of assault and battery, based on the alleged use of excessive force on May 29, 2021.  Sacra alleges that the defendants committed assault and battery by carrying him in a way that caused him pain, broke his wrist, injured his shoulder, and resulted in his loss of two teeth.  He also asserts that in relation to his deliberate indifference claim, the defendants "neglected their duty to keep [him] free from harm."  Corr. Am. Compl. ¶ 10, ECF No. 75.

The defendants assert that because their challenged actions in this case were taken while acting as employees of the Commonwealth of Virginia, they are entitled to sovereign immunity as to Sacra's state law claims, citing *Messina v. Burden*, 321 S.E.2d 657 (Va. 1984).  In determining whether defendants are entitled to this immunity, courts consider the following factors:

---

[7]  Sacra asserts in a responsive pleading that a video shows Bilbrey with Sacra in the RHU cell, twisting his broken wrist.  Sacra's claim in his Corrected Amended Complaint, however, merely accuses the officers (including Bilbrey) of cruel and unusual measures while transporting him to the RHU.  It is well established that Sacra cannot amend his claims against a defendant in his responses to the defendants' summary judgment motion.  *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009).  Therefore, I do not consider his assertion about Bilbrey twisting his broken wrist as a claim properly before the court.  Moreover, the camera cell video shows that Sacra actively thrashed and resisted the officers' attempts to remove his restraints, and he provides no facts showing that Bilbrey was aware Sacra's wrist was injured, let alone broken.

1. the nature of the function performed by the employee;

2. the extent of the state's interest and involvement in the function;

3. the degree of control and direction exercised by the state over the employee; and

4. whether the act complained of involved the use of judgment and discretion.

*Id.* at 663.

Under this standard, "ordinary negligence claims cannot lie against a law enforcement officer who was engaged in an essential governmental function involving the exercise of discretion and judgment at the time of the act alleged to be negligent." *Savage v. Cnty. of Stafford,* 754 F. Supp. 2d 809, 817 (E.D. Va. 2010). It is self-evident that the defendants in this case, transporting a prisoner from one part of the prison to another, were fulfilling just such a function that required discretion and judgment calls. Therefore, I conclude that they are entitled to sovereign immunity as to Sacra's ordinary negligence claim under Virginia law.

The sovereign immunity granted to qualifying state employees under *Messina* does not extend to intentional torts, however. *Colby v. Boyden*, 400 S.E.2d 184, 187 (Va. 1991). Therefore, I must deny the defendants' immunity defense as to Sacra's assault and battery claims. I also find no merit to their contention that the evidence would not support a claim of assault and battery. As explained earlier, there are genuine, material disputes of fact as to the circumstances of the transport incident.

Therefore, I will deny the summary judgment motion as to the assault and battery claims against all defendants except Bilbrey.

### III.   CONCLUSION.

In accordance with the foregoing, it is **ORDERED** as follows:

1. The defendants' Motion for Summary Judgment, ECF No. 82, is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to all claims against the defendants in their official capacities or claiming violations of state regulations; the negligence claim asserted in Claim 2; the violation of PREA asserted in Claim 3; and all claims against defendant Sergeant Marc E. I. Bilbrey. The motion is DENIED as to Claims 1 and 2, alleging excessive force, deliberate indifference to Sacra's safety, and bystander liability, in violation of the Eighth Amendment, and as to his supplemental state law claims of assault and battery related to Claim 1.

2. The Clerk shall terminate Sergeant Marc E. I. Bilbrey as a party to the case;

3. The Clerk shall set the remaining claims against Sergeant Austin H. Haga and Correctional Officers Jeffrey S. Bemis, Michael W. Restuccia, Michael B. Koger, and Billy D. Robinson for a jury trial at the Abingdon Courthouse at the court's earliest convenience.

ENTER:  September 25, 2023

/s/  JAMES P. JONES
Senior United States District Judge